# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

WILLIE ALBERT MCGHEE,

        Plaintiff,

    v.                                          Case No. 08-C-45

JEFF FREUND, CHRIS MUSHA,
OFFICER RIGERT, and SGT. DIETZLER,

        Defendants.

---

## DECISION AND ORDER

The plaintiff, Willie Albert McGhee, a Wisconsin state prisoner, filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983. He is proceeding *in forma pauperis* on an Eighth Amendment deliberate indifference to mental health claim. Before the court are: the plaintiff's motion for summary judgment; the defendants' cross-motion for summary judgment; the plaintiff's motion for impeachment, perjury, and lying; and the defendants' motion for leave to correct the summary judgment reply record. All of these will be addressed herein.

### STANDARD FOR SUMMARY JUDGMENT

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *McNeal v. Macht*,

763 F. Supp. 1458, 1460-61 (E.D. Wis. 1991). "Material facts" are those facts that, under the applicable substantive law, "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material facts" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The burden of showing the needlessness of trial – (1) the absence of a genuine issue of material fact; and (2) an entitlement to judgment as a matter of law – is upon the movant. However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Id.* at 267; *see also Celotex Corp.*, 477 U.S. at 324 ("proper" summary judgment motion may be "opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves ..."); Fed. R. Civ. P. 56(e) ("When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial"). "Rule 56(c) mandates the entry of summary judgment, . . . upon motion, against a party who fails to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

The fact that both parties have moved for summary judgment, and thus both parties simultaneously are arguing that there is no genuine issue of fact, does not

establish that a trial is unnecessary or empower the court to enter judgment as it sees fit. *See* 10A Charles Alan Wright et al. § 2720 at 327-28 (3d ed. 1998). The court may grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law on the basis of the material facts not in dispute. *See Mitchell v. McCarty*, 239 F.2d 721, 723 (7th Cir. 1957). Cross-motions for summary judgment do not convert a dispute into a question of law if material factual questions are involved and additional evidence may be adduced at trial which would be helpful in the disposition of the case. *See M. Snower & Co. v. United States*, 140 F.2d 367 (7th Cir. 1944). Each party, as a movant for summary judgment, bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to a judgment as a matter of law. The fact that one party fails to satisfy that burden on its own motion does not automatically indicate that the opposing party has satisfied its burden and must be granted summary judgment on the other motion. *See* 10A Charles Alan Wright et al. § 2720 at 335.

## FACTS[1]

The plaintiff was incarcerated at the Oshkosh Correctional Institution (OSCI) at all times relevant. (McGhee 11/26/08 Aff. ¶ 2). Defendant Christopher Musha is employed by the Wisconsin Department of Corrections (DOC) as a sergeant at

---

[1] This section is taken from the plaintiff's affidavit in support of his motion for summary judgment (McGhee 11/26/08 Aff.), the plaintiff's affidavit in response to the defendants' motion for summary judgment (McGhee 1/8/09 Aff.), the defendants' proposed findings of fact in support of their motion for summary judgment (DFOF), and the defendants' additional proposed findings of fact in support of their reply to the plaintiff's response to defendants' motion for summary judgment (DFOF). Facts that do not comply with Federal Rule of Civil Procedure 56(e) are not included in this section.

-3-

OSCI. (DFOF ¶ 2). At all times relevant, Musha worked in Housing Unit I, which is located in the W Building. (DFOF ¶ 4). Defendant Paul Rigert, who is employed by the DOC as a correctional officer at OSCI, also worked in the W Building. (DFOF ¶¶ 5, 7). Defendant Jeff Freund is employed as a crisis intervention worker at OSCI. (DFOF ¶ 22). His duties include planning programs to identify, prevent, and manage crisis situations within the institution, providing direct mental health and counseling services to inmates facing crisis situations, and providing consultation and training regarding crisis management and prevention. (DFOF ¶ 23).

On October 30, 2007, defendant Musha observed the plaintiff and his cellmate playing poker, using their laundry tokens as currency, which is a violation of DOC rules. (DFOF ¶ 8). He confronted the two cellmates, and asked the plaintiff to hand over his laundry tokens and playing cards. *Id.* The plaintiff became disruptive, demanded to see a supervisor, and disobeyed several direct orders to turn over the items. *Id.* Musha's supervisor arrived on the unit and demoted the plaintiff from Program 3 Segregation (W Building) to Program 2 Segregation (Segregation Building). *Id.* The plaintiff was issued a conduct report for his behavior. *Id.*

On October 31, 2007, after being transferred to the Segregation Building, the plaintiff pressed the medical emergency button in his cell and requested to speak to a crisis intervention worker. (McGhee 1/8/09 Aff. ¶ 3). A security staff member notified defendant Freund that the plaintiff wished to speak with someone from the clinical services staff. (DFOF ¶ 25). Freund was in the process of doing his weekly

-4-

clinical rounds and replied that he would speak with the plaintiff when he got to his cell. *Id.* When Freund arrived there, the plaintiff informed him that he was having a nervous breakdown, could not eat or sleep, that he was emotionally unstable, and that he felt like he was dying inside. (McGhee 1/8/09 Aff. ¶ 5). The plaintiff stated that he was upset because he had recently been sent back to Segregation Building, that he had been scheduled to be released from Program 3 Segregation Status within the next two weeks, and that the latest accusation could delay this release. (DFOF ¶ 26; McGhee's 11/26/08 Aff. ¶ 6).

The parties dispute Freund's response to the plaintiff. According to the plaintiff, Freund assured him that he should give him a few minutes so that he could get an officer escort to bring the plaintiff to his office so that they could speak in private about his condition. (McGhee 1/8/09 Aff. ¶ 6). According to the defendants, Freund informed the plaintiff that he would speak with the W Building staff involved with the conduct report to hear their version and once he obtained the relevant information, he would return and have staff remove the plaintiff from his cell so that they could further discuss the matter. (DFOF ¶ 27). The defendants also assert that Freund informed the plaintiff he would return that day or the next, depending on the availability of the officers and other demands for his time. (DFOF ¶ 28).

Based upon his conversation with the plaintiff, Freund's assessment was that the plaintiff was not in any distress nor was he at immediate risk for self-harm or harm to others. (DFOF ¶ 29). Freund did not take any action to place the plaintiff

in observation status or protective placement because he was not talking about harming himself nor was he exhibiting any behavior that would lead Freund to believe that he was emotionally unstable and unable to control his actions. *Id.* The plaintiff was voicing his displeasure of being accused of gambling which resulted in him being sent back to Program 2 segregation status. *Id.* Freund was not able to find out any information about the plaintiff's situation as those staff involved were not working and would not be back until the next day. (DFOF ¶ 30). Therefore, Freund did not come back to speak with the plaintiff on October 31, 2007. *Id.*

Inmates in Program 3 Segregation enjoy certain privileges and benefits which are not available in Program 2 Segregation. (DFOF ¶ 9). Program 2 is a more severe disciplinary form of segregation than Program 3. *Id.* One of the differences in privileges and benefits is the type and method of canteen items inmates may possess in Program 3 versus Program 2. *Id.* Processing Program 3 canteen orders from inmates is a two day process. (DFOF ¶ 10). Inmates order canteen on day one and the order is handed out the following day. *Id.* Security staff is not required to inspect any canteen given to Program 3 Inmates, because of the property those inmates can have. *Id.* Inmates in Program 3 status can have the same property as inmates in General Population. *Id.* However, the canteen items that inmates are allowed in Program 2 Segregation are more limited. *Id.*

The plaintiff ordered canteen while he was in Program 3 Segregation in the in W Building. (DFOF ¶ 11). By the time the order was delivered, the plaintiff had

-6-

been moved to Program 2 Segregation because of the gambling incident described above. *Id.* On October 31, 2007, defendant Musha and fellow officers finished handing out the Program 3 Segregation canteen order to the inmates in their housing unit and noted that the plaintiff's order remained. (DFOF ¶¶ 11, 14). Musha informed Rigert that the plaintiff had been demoted to Program 2 Segregation and asked Rigert to deliver the plaintiff's canteen order to Segregation Building. (DFOF ¶¶ 12, 14; McGhee 1/8/09 Aff. ¶ 11). Rigert walked the plaintiff's canteen to the Segregation Building and informed the officer on duty that he had the plaintiff's canteen order. (DFOF ¶ 15). The officer on duty was busy escorting another inmate in restraints and Rigert offered to deliver the plaintiff's canteen order to him. (DFOF ¶ 16). Rigert opened the plaintiff's trap door and handed him a printed copy of his order, handed the plaintiff the larger items, and then handed the remaining items to him. (DFOF ¶ 17; McGhee 1/8/09 Aff. ¶ 12). The plaintiff reviewed the canteen items, signed his receipt, and handed it to Rigert. *Id.*

Because Rigert does not regularly work in the Segregation Building, it did not occur to him that there might be some items in the plaintiff's canteen order that he was not allowed to have pursuant to OSCI rules. (DFOF ¶ 18). Therefore, Rigert did not screen the canteen order to remove any such items. *Id.* Despite the fact that the plaintiff himself was familiar with segregation rules and knew he was not allowed to possess razors in segregation, he did not call this error to Rigert's attention. (DFOF ¶ 19). Although as the delivering officer it was primarily Riegert's

responsibility to ensure that no prohibited canteen items were delivered, inmates are expected to abide by the rules and police their own conduct. *Id.*

When Rigert delivered the canteen items, the plaintiff did not appear to be in any distress and he did not say anything about being depressed, needing to see clinical staff, or harming himself. (DFOF ¶ 20). Rigert made an error by delivering to the plaintiff canteen items he should not have had in the Segregation Unit, specifically, the disposable razors. (DFOF ¶ 21). This was accidental on Rigert's part because of the circumstances that arose in the timing of the canteen order and its delivery. *Id.* Riegert did not deliberately give the plaintiff items he was not supposed to have. *Id.*

On October 31, 2007, the plaintiff used the razors that Rigert delivered to him to "severely" cut his wrists in an attempt to kill himself. (McGhee 11/26/09 Aff. ¶ 8; McGhee 1/8/09 Aff. ¶ 13).

On October 31, 2007, after the plaintiff engaged in the self-harm attempt by cutting his wrists with the razors, he was treated by the health services unit staff at the institution and placed in observation status. (DFOF ¶ 49). The nursing staff evaluated and treated the cuts on the plaintiff's wrists, which were described as "superficial" in medical progress notes. (DFOF ¶ 50). The plaintiff obtained regular follow-up medical care from October 31, 2007, through November 16, 2007, by the institution's health services unit staff as a preventive measure and to ensure proper healing of the cuts on his wrist. (DFOF ¶ 51). By November 16, 2007, the treatment

-8-

notes from the plaintiff's visit with medical staff document that his wrist wounds were "healed" with no "erythema, edema or drainage." (DFOF ¶ 52). Scars were noted over the healed areas. *Id.*

On October 31, 2007, after the plaintiff engaged in the self-harm attempt, Dr. Wilinski placed him in observation status which required fifteen minute checks by correctional staff. (DFOF ¶ 53). Defendant Freund saw and evaluated the plaintiff on two occasions after the self-harm event. (DFOF ¶ 54). On November 2, 2007, Freund did a follow-up review of the plaintiff's observation placement and continued his observation status. *Id.* On November 5, 2007, Freund saw and evaluated the plaintiff and released him from observation status based upon the plaintiff's progress. (DFOF ¶ 55).

Freund served as the plaintiff's crisis worker while he was housed in both Segregation and W Buildings at OSCI so he had some familiarity with the plaintiff's background and issues involving his counseling history. (DFOF ¶ 34). Although the plaintiff had a history of suffering from situational depression, he did not have a history of self-harm activities, nor did he have a history of presenting with suicidal thoughts. *Id.* Freund used his best clinical judgment to assess the plaintiff's situation before his self-harm event on October 31, 2007, and continued to do so in his treatment of the plaintiff since that time. *Id.*

The plaintiff filed an administrative grievance with the inmate complaint system and an appeal to the corrections complaint examiner. (Pl. 11/26/08 Aff. ¶ 10). In his

-9-

inmate complaint, the plaintiff alleged that prison officials violated institution procedure by giving him dangerous items not allowed in inmates' possession at 7:30 p.m. in segregation. *Id.* The inmate complaint system dismissed the grievance and that decision was affirmed on appeal. On November 20, 2007, Inmate Complaint Examiner Timothy Pierce issued his recommendation that the plaintiff's offender complaint OSCI-2007-33977 be dismissed. Mr. Pierce's ICE Report included the following Summary of Facts:

> The complainant is apparently blaming OSCI staff for his recent slitting of his own wrists. Evidently staff inadvertently gave him razors that he used to slit his wrists. The complainant was moved from Program 3 in W-Building to segregation building on the date in question.
>
> It is unfortunate that staff gave you your razors. You ordered canteen that was received on the date you moved to Seg. W-Building brought you your canteen and they gave it to you as segregation staff was busy. You then used one of these razors to slit your wrist. Capt. Schaub is well aware of this and it has been addressed with the staff in question.
>
> The complainant also claims that prior to being given these razors he was having a nervous breakdown and was talking to Mr. Freund about this. He states Mr. Freund was going to come back and talk to him, but he did not and this also played a factor in the cutting of his wrist. Mr. Freund informed that he did talk to the complainant but did not tell him he was coming back to talk to you. He assured me that you did not tell him anything about having suicidal tendencies. It is very unfortunate that you used one of these razors, but it was not the fault of OSCI staff that you did this to you. No further action is needed by this office.

(Pl.'s Ex. C at 4).

## ANALYSIS

The plaintiff contends that he was denied medical attention for his mental illness in that prison officials disregarded a known risk of serious injury and violated

-10-

institution security procedure by recklessly giving him dangerous items not allowed

in inmates' possession in the Segregation Building. The plaintiff claims that Freund's

denial of his request for medical treatment resulted in the plaintiff trying to commit

suicide. The plaintiff further contends that defendants Rigert and Musha recklessly

gave and allowed delivered to him a package of disposable razors while he was

housed in Segregation Building. The plaintiff contends that the defendants' actions

violated his rights under the Eighth Amendment.

The defendants contend that there is no basis for finding that they were

deliberately indifferent to the plaintiff. Specifically, the defendants argue that Musha

and Rigert did not recklessly disregard any risk to the plaintiff and that Freund did

not deliberately disregard the plaintiff's needs.

To establish liability under the Eighth Amendment in a medical care case, a

prisoner must show: (1) that his medical need was objectively serious; and (2) that

the official acted with deliberate indifference to the prisoner's health or safety.

*Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Chapman v. Keltner*, 241 F.3d 842,

845 (7th Cir. 2001); *see also Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976);

*Zentmyer v. Kendall County, Ill.*, 220 F.3d 805, 810 (7th Cir. 2000). Both suicide and

attempted suicide are serious medical needs under the Eighth Amendment. *Collins

v. Seeman*, 462 F.3d 757, 760-61 (7th Cir. 2006) (quoting *Sanville v. McCaughtry*,

266 F.3d 724, 733 (7th Cir. 2001)).

-11-

The defendants do not argue that the plaintiff's injuries do not constitute a serious medical need. Thus, the court turns to whether a reasonable factfinder could conclude that the defendants were deliberately indifferent to that need.

In attempted suicide cases, the deliberate indifference prong of an Eighth Amendment claim requires a showing that the defendants: (1) subjectively knew the prisoner was a substantial risk of committing suicide; and (2) intentionally disregarded the risk. *Seeman*, 266 F.3d at 761 (citing *Matos ex rel. Matos v. O'Sullivan*, 335 F.3d 553, 556 (7th Cir. 2003); *see also Estate of Novack ex rel. Turbin v. County of Wood*, 226 F.3d 525, 529 (7th Cir. 2000) (defendant must be aware of the significant likelihood that an inmate may imminently seek to take his own life and must fail to take reasonable steps to prevent the inmate from performing the act)). The defendant "must be cognizant of the significant likelihood that an inmate may imminently seek to take his own life." *Seeman*, 266 F.3d at 761 (citing *Estate of Novack*, 226 F.3d at 529).

Assuming the defendants are subjectively aware that a prisoner is a suicide risk, they must also intentionally disregard that risk.

> Deliberate indifference requires a showing of "more than mere or gross negligence, but less than purposeful or knowing infliction of harm." *Matos*, 335 F.3d at 557; *Estate of Novack*, 226 F.3d at 529. We have characterized the required showing as "something approaching a total unconcern for [the prisoner's] welfare in the face of serious risks." *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir. 1992). To establish deliberate indifference, a plaintiff must present evidence that an individual defendant intentionally disregarded the known risk to inmate health or safety. *Matos*, 335 F.3d at 557. A defendant with knowledge of a risk need not "take perfect action or even reasonable action[,] ... his

-12-

action must be reckless before § 1983 liability can be found." *Cavalieri v. Shepard*, 321 F.3d 616, 622 (7th Cir. 2003).

*Seeman*, 462 F.3d at 762.

In *Seeman*, after a prisoner committed suicide in his cell, his mother brought a § 1983 action on behalf of the estate against several correctional officers alleging that they were deliberately indifferent to a substantial risk that the prisoner would take his own life. 462 F.3d at 759. Approximately fifty-five minutes before the suicide was discovered, the prisoner told a correctional officer that he was feeling suicidal and that he wanted to see the crisis counselor. *Id.* Although the officer passed along the request, at some point the information that the prisoner was feeling suicidal was dropped and the message was sent as a generic request to see the crisis counselor. *Id.* In the meantime, the officer returned to the prisoner's cell and told him the counselor had been called and would respond as soon as she could. *Id.* The prisoner told the officer that he was fine and could wait until the counselor arrived. *Id.* In the intervening thirty minutes, correctional officers checked on the prisoner and he was all right. *Id.* At some point before the next cell check – approximately twenty minutes after the last – the prisoner hanged himself in his cell using a bed sheet. *Id.*

The Seventh Circuit Court of Appeals affirmed the district court's decision granting summary judgment in favor of the defendant correctional officers on the Eighth Amendment claim. *Id.* The court held that three of the correctional officers were not subjectively aware that the prisoner was a suicide risk, and thus were not

-13-

liable for Eighth Amendment violation in connection with his death, where they were

informed that the prisoner had requested to see crisis counselor, but were not

informed that he had said he was suicidal, and inmates often requested meetings

with crisis counselors for reasons both serious and mundane. *Id.* at 761. The court

also held that the officer who the prisoner informed that he was feeling suicidal did

not recklessly or intentionally disregard a known risk of suicide where he immediately

informed the control room after the prisoner requested a crisis counselor and said

he was feeling suicidal, returned to prisoner's cell and received assurance that the

prisoner would be all right until the counselor arrived, and again returned to the cell

within fifteen to twenty minutes, and another officer then assumed responsibility for

monitoring the prisoner. *Id.* at 762.

In this case, it is undisputed that defendant Freund went to the plaintiff's cell

after the plaintiff requested to see a crisis intervention worker. The plaintiff informed

Freund that he was having a nervous breakdown, could not eat or sleep, that he was

emotionally unstable, and that he felt like he was dying inside. The parties dispute

when Freund said that he would return. According to the plaintiff, Freund said he

would get an officer escort and return in a few minutes so that could speak privately

about his condition in Freund's office. According to the defendants, Freund told the

plaintiff that after speaking with the officers involved in the gambling incident and

conduct report, he would return that day or the next and have staff remove the

plaintiff from his cell so that they could discuss the matter. However, even if, as the

-14-

plaintiff asserts, Freund told him that he would return in a few minutes, it is undisputed that following the conversation with the plaintiff Freund did not think that the plaintiff was at immediate risk for self-harm or harm to others. Freund avers that he did not take action to place the plaintiff in observation status or protective placement because the plaintiff did not talk about harming himself and he did not exhibit behavior that would lead Freund to believe he was emotionally unstable and unable to control his actions. In addition, Freund had familiarity with the plaintiff's background because he had served as his crisis worker previously. While the plaintiff had a history of suffering depression, he did not have a history of self-harm activities or of presenting with suicidal thoughts. Based on the undisputed facts, the court finds that Freund did not act with deliberate indifference to a substantial risk that the plaintiff would attempt suicide.

The undisputed facts also do not support a finding that defendants Musha or Rigert were deliberately indifferent to a risk that the plaintiff would commit suicide. There is no indication in the record that either defendant was even aware that the plaintiff was feeling bad. When Rigert delivered the canteen order to the plaintiff's cell, and accidentally gave the plaintiff the disposable razors he had ordered, the plaintiff did not appear to be in any distress and did not say anything about being depressed, needing to see clinical staff, or harming himself. No reasonable factfinder could conclude that Musha or Rigert were deliberately indifferent to a risk

that the plaintiff would commit suicide. Accordingly, the defendants' motion for summary judgment will be granted and the plaintiff's motion will be denied.

Sergeant Dietzler remains as a defendant. He was never served with a summons and complaint and was deployed on military service on March 1, 2008. (Defs.' Br. at 1 n.1). According to the defendants, Sgt. Dietzler is not expected to return from his deployment until approximately February 2010 and the Servicemembers' Civil Relief Act applies to the claims against him. 50 U.S.C. App. § 502. The court could stay this action as to the plaintiff's claim against Dietzler until he returns. However, the plaintiff's only claim against Dietzler is that defendants Sgt. Musha and Sgt. Dietzler failed to comply with DOC procedure in that they did not inspect the canteen order. Based on the analysis set forth *supra.*, the court finds that any claim against Dietzler is doomed to fail and, therefore, he will be dismissed from this case.

## ADDITIONAL MATTER

On January 29, 2009, the plaintiff filed a motion for impeachment, perjury, lying and affidavit submitted in bad faith. The plaintiff's motion is submitted against defendant Freund and his attorney. On February 12, 2009, the defendants filed a motion for leave to correct the summary judgment reply record. This filing explains an error the defendants made in their reply brief and also in their response to the plaintiff's motion for impeachment. The defendants' motion explains that they

inadvertently argued that the meeting with the plaintiff and Freund took place on

October 30, 2007, instead of October 31, 2007.  The defendants assert:

> The grounds for this motion are as follows: The error which plaintiff has correctly pointed out to the court was made by counsel, not by the defendants. (See, Document 68).  Counsel mistakenly confused the date that plaintiff was placed in Segregation as punishment for his gambling conduct, which was October 30, 2007, with the date plaintiff met with defendant Freund, which was October 31, 2007.  Thus, portions of the two briefs noted above contain this error.  However, the parties' affidavits have consistently agreed that the date when defendant Freund and plaintiff McGhee met was October 31, 2007 and that later that same date, McGhee engaged in the self-harming incident which is the subject of this lawsuit.  In addition, all of the proposed findings of fact submitted by the parties accurately set forth the dates at issue in the case.
>
> Counsel apologizes to the plaintiff and the court for this error and regret any confusion which it may have caused.  There remains no material dispute which would preclude summary judgment, as defendants continue to maintain that, even if plaintiff's version of events is accepted, he has failed to meet the burden of showing deliberate indifference as to any of the defendants.
>
> Therefore, the defendants respectfully request that this court grant leave to accept this filing as a correction to the Defendants' Reply Brief in Support of the Defendants' Motion for Summary Judgment and In Opposition to Plaintiff's Motion for Summary Judgment (Document 62) and to the Defendants' Response to Plaintiff's Motion for Impeachment, Perjury, Lying and Affidavit Submitted in Bad Faith (Document 66).

(Defs.' Mot. at 1-2).  The defendants' explanation speaks for itself and the court will,

therefore, accept their motion to correct the record and deny the plaintiff's motion for

impeachment.

Accordingly,

-17-

**IT IS ORDERED** that the plaintiff's motion for summary judgment (Docket #39) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that the defendants' motion for summary judgment (Docket #44) be and the same is hereby **GRANTED**, and this action **DISMISSED** on the merits;

**IT IS FURTHER ORDERED** that the plaintiff's motion for impeachment (Docket #58) be and the same is hereby **DENIED**; and

**IT IS FURTHER ORDERED** that the defendants' motion for leave to correct record (Docket #70) be and the same is hereby **GRANTED**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 28th day of July, 2009.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge